796 F.2d 400
 TEXAS STATE COMMISSION FOR THE BLIND and State of Texas, Appellees,
v.
The UNITED STATES, Appellant.
 Appeal No. 85-1954.
 United States Court of Appeals,
Federal Circuit.
 June 26, 1986.
 
 Ronald A. Schechter, Commercial Litigation Branch, Dept. of Justice, of Washington, D.C., argued for appellant. Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director, and Thomas W.B. Porter, Commercial Litigation Branch, Dept. of Justice, were on the brief for appellant. Charles G. Symmonds, Office of General Counsel, Army & Air Force Exchange Service, of counsel.
 Philip Durst, Asst. Atty. Gen., Austin, Tex., argued for appellee. With him on the brief were Jim Mattox, Atty. Gen. of Texas, David R. Richards, Executive Asst. Mary F. Keller, Sp. Asst. and J. Patrick Wiseman, Chief, State & County Affairs.
 Before MARKEY, Chief Judge, FRIEDMAN, RICH, DAVIS, BALDWIN, SMITH, NIES, NEWMAN, BISSELL and ARCHER, Circuit Judges.[1]
 NIES, Circuit Judge.
 
 
 1
 The United States appeals from the judgment of the U.S. Claims Court[2] holding the United States liable under the income-sharing provisions of the Randolph-Sheppard Vending Stand Act, 20 U.S.C. Secs. 107-107f (1982), to the Texas State Commission for the Blind and the State of Texas (collectively hereafter, TSCB) for income derived from vending machines operated by the military exchanges of the Department of Defense. We reverse.
 
 I.
 
 2
 This appeal involves a question of statutory interpretation of the Randolph-Sheppard Act (the Act). More precisely, the issue is whether a regulation of the Department of Defense (DOD) reasonably interprets the scope of the statutory exemption provided for military exchanges from the requirements of the Act that income from vending machines on federal property be shared with blind vendors and/or state blind agencies.
 
 
 3
 In 1936, Congress passed the Randolph-Sheppard Act, Ch. 638, 74 Stat. 1559 (1936) (current version at 20 U.S.C. Secs. 107-107f (1982) ), to provide blind persons with remunerative employment and economic opportunities by permitting them to operate vending stands in federal buildings. The program was only moderately successful. Part of the problem was general apathy to the program among the agencies. In addition, civilian employee welfare and recreation groups were being permitted by agencies to place vending machines in federal buildings to finance the activities of such groups. The competition from these machines diverted income from blind vendors and made the establishment of new vending stands economically unattractive.
 
 
 4
 The practice of allowing employee groups, such as unions, to utilize federal property free of charge and to retain the funds without any accountability was of questionable legality. In 1952, the Comptroller General issued an opinion advising the Attorney General that funds derived from vending machines at the Federal Bureau of Investigation were received "for the use of the United States" within the meaning of that phrase in 31 U.S.C. Sec. 484 and were required to be deposited into the Treasury as miscellaneous receipts. Comp.Gen.Dec. B-111,086, 32 Comp.Gen. 124 (1952). In view of that opinion, the Comptroller General, in a related opinion that year, ruled that the practice of allowing postal employee groups to install vending machines on federal property and retain the profits was of "doubtful" legality. However, the Comptroller General concluded that his office would "interpose no objection to the continued use of proceeds by employee groups" pending action on clarifying legislation which the Controller General had recommended to Congress.[3]
 
 
 5
 In 1954, Congress amended the Randolph-Sheppard Act to make it more effective. Amendments to the Randolph-Sheppard Vending Stand Act, Pub.L. No. 83-565, Sec. 4, 68 Stat. 663 (1954). These amendments mandated that blind vendors be given a "preference," so far as feasible, in establishing new stands on federal property and authorized the heads of agencies to assign vending machine income to blind vendors with whom vending machines directly competed in order to assure such "preference." However, it appears that the assignment of income power was virtually ignored. In 1962, Senator Randolph, in proposing further amendments to improve the opportunities for the blind, specifically recognized that vending machines of civilian employee groups were the source of the problem and urged that such groups could and should find "other means of financing [their] projects." Operation of Vending Stands for the Blind in Federal Buildings: Hearing on S. 394 Before the Special Subcomm. of the Senate Comm. on Government Operations, 87th Cong., 2d Sess. 10 (1962).
 
 
 6
 In 1974, over strong opposition by civilian employee groups, particularly the Postal Workers Union, significant changes were made in the Act because of continued congressional dissatisfaction with the limited expansion of the blind vendor program. Randolph-Sheppard Act Amendments, Pub.L. No. 93-516, Title II, 88 Stat. 1622 (1974). These amendments were in large part, again, the result of the efforts of Senator Randolph and included provisions by which blind vendors were given "priority" (not merely a preference) in operating new facilities so as to increase their numbers; the items allowed to be sold were expanded; and income from vending machines--with some exemptions--was required to be shared either with blind vendors directly or with state agencies for the blind. The sharing percentages are 100% for machines in direct competition with blind vendors; 50% where there is no direct competition unless at least half of the hours worked on the premises where the machines are located are outside normal working hours; and 30% in the latter case. 20 U.S.C. Sec. 107d-3(b)(1) (1982).
 
 
 7
 The exemption provided in the 1974 amendments, which concerns us here, is found in 20 U.S.C. Sec. 107d-3(d) (1982) and provides:
 
 
 8
 Subsections (a) and (b)(1) [income sharing] of this section shall not apply to income from vending machines within retail sales outlets under the control of exchange or ships' stores systems authorized by title 10, or to income from vending machines operated by the Veterans Canteen Service, or to income from vending machines not in direct competition with a blind vending facility at individual locations, installations, or facilities on Federal property the total of which at such individual locations, installations, or facilities does not exceed $3,000 annually. [Emphasis added.]
 
 
 9
 A DOD regulation, 32 C.F.R. Sec. 260.3(i)(3)(i) (1985), interprets this exemption to exclude:
 
 
 10
 Income from vending machines operated by or for the military exchange or ships' stores systems.
 
 
 11
 A number of state agencies, TSCB being one, nevertheless, sought to share in the income of military exchanges. In May, 1979, TSCB filed a complaint with HEW which resulted in the convening of an arbitration panel, as provided in the statute (20 U.S.C. Sec. 107d-1(a) (1982) ), to adjudge the validity of its asserted right to a share of vending machine income of the military exchanges. TSCB argued that the statutory exemption covered only those vending machines of the military exchanges physically located within the four walls of military exchange stores.
 
 
 12
 In a split decision, the arbitration panel of three held that the position of TSCB was the correct interpretation of the statute. Texas (Texas State Commission for the Blind) v. Department of Defense, No. RS 79-4 (Sept. 2, 1981). The majority of the arbitrators stated that the statutory language did not "appear to be ambiguous." Slip op. at 11. "Within retail sales outlets," per the two arbitrators, would normally be understood to mean "inside the four walls of an exchange system store." They then recognized that "within" could also mean "a part of" but concluded that this would render the phrase "retail sales outlets" meaningless. Slip op. at 11-12. On the other hand, the unequivocal legislative history against reaching income of the military exchanges raised questions in their minds as to the "clarity" of the language. Slip op. at 12. Ultimately, the two arbitrators resolved the question of the scope of the military exemption by reliance "on the general intent and approach of the legislation itself. These facts argue for a narrow reading of any limitation on opportunities for the blind." Slip op. at 15. To be exempt, they concluded, vending machines had to be "within the four walls of an exchange system store" but "expressly [did] not decide the issue of whether vending machines directly outside retail sales outlets are to be deemed inside or outside these stores." Slip op. at 18 and n. 27. The majority found final support for its position in regulations of the Department of Health, Education and Welfare (HEW), the principal agency under the Act charged with its administration. The majority did not rely on specific language in the HEW regulations (the regulations simply repeat the statute), but on HEW's refusal to amend its regulations to include the broad exemption language requested by DOD. Slip op. at 16-17.
 
 
 13
 The dissenting arbitrator, in reaching his conclusion that DOD's position was correct, relied on the essentially different nature of the military exchanges from civilian employee welfare and recreation groups. Through the profits generated by military exchanges, essential governmental support services were provided for military service personnel and their families. He noted that extracts from Congressional Hearings and Reports of record dated 1949, 1953, 1970, 1972, 1974, 1978 and 1979 on non-Randolph-Sheppard legislation established that this arrangement had been recognized and approved by Congress as mutually beneficial to service personnel and to the public fisc. In his view, the legislative history unequivocally indicated that the military exchange systems were intended to be exempt and that that purpose could be given effect without a strained reading of the words of the statute.
 
 
 14
 In the minority arbitrator's view, the statutory language had no "plain meaning." Indeed, TSCB had conceded that the statutory words "retail sales outlet" and "within" were susceptible to more than one interpretation, and the majority opinion had expressly left open the question whether vending machines directly outside exchange stores should be deemed "within" such stores under the statute. The "plain language" of the statute seen by the majority, in his words, "turned out not to be so plain."
 
 
 15
 Following the decision of the arbitration panel, on September 2, 1981, TSCB sought to obtain enforcement of the arbitration decision by the Department of Education (DOE), which had succeeded to HEW's authority under the Randolph-Sheppard Act. Act of October 17, 1979, Pub.L. No. 96-88, Title VI, 93 Stat. 696. In the interim, the State of Oklahoma had initiated litigation in federal district court against DOD on a comparable claim to military exchange income.[4] Because of the conflict between the interpretations of the statute by two government departments (DOE and DOD), DOE referred the matter to the Department of Justice for resolution, as required by Executive Order No. 12,146, 3 C.F.R. Sec. 409.411 (1980). On February 1, 1982, the Department of Justice advised that it resolved the conflict in favor of DOD. Therefore, the Department of Justice undertook to defend the Oklahoma suit on the basis of DOD's interpretation.
 
 
 16
 The decisions in the Oklahoma litigation are reported at Oklahoma v. Weinberger, 582 F.Supp. 293 (W.D.Okla.1982), aff'd, 741 F.2d 290 (10th Cir.1983). In sum, those courts held that the statutory language was not without some ambiguity as evidenced by the changes in HEW's position during the drafting of its own regulations.[5] In their view, the proposed narrow interpretation was contrary to the intent of Congress, since limiting the exemption to vending machines physically within exchange stores would effectively deprive the exchanges of any exemption. On the other hand, the DOD regulation, endorsed by the Department of Justice, was consistent with the statutory language, the purpose of the exemption, and congressional intent in the overall purpose of the Act. Thus, both the Oklahoma district court and the 10th Circuit held DOD's regulation valid.
 
 
 17
 The suit by TSCB, seeking enforcement of the arbitration award in its favor, was filed in the United States Claims Court in March, 1983. The Claims Court rendered its decision, upholding the award, after the 10th Circuit decision, thereby creating a clear conflict in interpretation.
 
 
 18
 The Claims Court's decision turned particularly on the meaning of the statutory term "within." The common usage of the term, per the court, "contemplates spatial boundaries." 6 Cl.Ct. at 738. The court discounted the significance of the legislative history relied on by the 10th Circuit since the Claims Court considered the history to be "at odds" with the concept of "within physical boundaries." 6 Cl.Ct. at 740. A particular colloquy on the House floor between Messrs. Brademas and Sikes (which specifically supports DOD's interpretation) was discounted because it occurred after the Senate passed the bill and could not have been considered by that body.[6] Id. at 741. The Claims Court viewed other portions of the legislative history as supporting TSCB's position because of the use of the words "retail outlet" therein which, in its understanding, meant a store.[7] Id. at 740. The court also noted the Conference Report characterizing the exemption as excluding "certain locations." Id. citing S.Rep. No. 1270, 93rd Cong., 2d Sess. 35 (1974); H.R.Rep. No. 1457, 93rd Cong., 2d Sess. 35 (1974). Further, the legislative history's reference to the Marine Corps base in Albany, Georgia, as a "model" because of the number of blind vendors was seen to overcome DOD's argument that the income-sharing provisions were directed to the civilian groups only. 6 Cl.Ct. at 741.
 
 
 19
 Finally, since the majority of vending machines on DOD-controlled property are operated by the exchange system, the congressional purpose of the act would be frustrated, per the Claims Court, if these were exempt. To avoid "nullifying" the statute, the court ruled in favor of TSCB. Id. at 741-42.
 
 
 20
 The court certified the question of statutory interpretation to this court which accepted jurisdiction.[8]
 
 II.
 
 21
 Upon consideration of the statutory language, the legislative history, the purpose of the exemption, and the status of the military exchanges as non-appropriated fund instrumentalities performing essential governmental services, we conclude that the Claims Court erred in voiding the DOD regulation.
 
 
 22
 The task before us of interpreting the statutory language of the military exchanges exemption is succinctly summarized in United States v. Turkette, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981):
 
 
 23
 In determining the scope of a statute, we look first to its language. If the statutory language is unambiguous, in the absence of "a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive." Consumer Products Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 [100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Of course, there is no errorless test for identifying or recognizing "plain" or "unambiguous" language. Also, authoritative administrative constructions should be given the deference to which they are entitled, absurd results are to be avoided and internal inconsistencies in the statute must be dealt with. Trans Alaska Pipeline Rate Cases, 436 U.S. 631, 643 [98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978); Commissioner v. Brown, 380 U.S. 563, 571 [85 S.Ct. 1162, 1166, 14 L.Ed.2d 75 (1965).
 
 
 24
 In this case, the statement of the difficulty in identifying "plain" or "unambiguous language" is particularly apropos. Whether or not words of a statute are clear is itself not always clear. Even if the "common" understanding of "within retail sales outlets" were physically within the walls of a store, as the Claims Court held, that does not make the subject phrase "plain" or "unambiguous." The determination of what usage of particular words is common must be rejected as an "errorless test."
 
 
 25
 Moreover, even where a statute is clear on a purely linguistic level, interpretation may be necessary if that interpretation does not do justice to the realities of the situation. As stated by the Supreme Court in Church of the Holy Trinity v. United States, 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892), it is a "familiar rule that a thing may be within the letter of the statute, but not within its spirit nor within the intention of its makers." See also United States v. Riverside Bayview Homes, Inc., --- U.S. ----, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985) (argument that it is "unreasonable to classify 'lands,' wet or otherwise, as 'waters' " is "simplistic.")
 
 
 26
 Finally, the question in this case is not what interpretation this court would give to the statute were it the executive branch. The issue to be decided by this court is whether the statute is capable of more than one interpretation and whether the agency's interpretation is reasonable.
 
 
 27
 With these premises in mind, we turn to the statutory analysis.
 
 III.
 
 28
 The arbitration award represents an amount estimated to be in excess of $10 million which must be paid from DOD current funds for essential government services for the military and their families. The brief review of legislative history noted above indicates that the funds Congress anticipated would be used for the state agencies for the blind were funds which could be diverted at no cost to the government and no diminution in essential government services. In keeping with that expectation, Congress over a period of 11 years has failed to appropriate any moneys to make up for the loss of exchange funds which the Claims Court held Congress intended to be transferred to the blind.
 
 
 29
 No rational reason can be advanced to conclude that Congress intended military personnel and their families to support the blind by giving up essential services. Indeed, the whole rationale behind the Claims Court's finding that it had jurisdiction over the claim here shows the special nature of the funds generated by the military exchange systems and differentiates such funds from those of private groups organized by civilian employees, such as employees' unions, which were clearly intended to be diverted to the blind.[9] As indicated, the funds of the latter-type of organizations were being used without any governmental control for whatever group activities their membership wished, such as flowers for the sick, birthday and wedding gifts, band uniforms, scholarships, furnishings for recreation rooms, and general social activities.[10] No funding by Congress can be provided for such activities. In contrast, the only services financed by the funds of the military exchanges are child care centers, libraries, youth activities, gymnasiums, arts and crafts facilities and similar essential support services, which are furnished around the world for military personnel and families. Such services are of a nature for which appropriated funds are also used, indeed, have been provided by yearly Congressional appropriation. The amount of exchange-generated funds is taken into account in determining the amount of the appropriation. Precisely because of this interrelationship, the Claims Court found it had jurisdiction over this claim under the precedent of United States v. General Electric Corp., 727 F.2d 1567, 1570 (Fed.Cir.1984) and cases cited therein. Texas State Commission for the Blind v. U.S., 6 Cl.Ct. at 737-38.
 
 
 30
 The Claims Court avoided what it called the "difficult question" which would be raised were additional appropriated funds necessary as a result of its judgment (28 U.S.C. Sec. 2517, 31 U.S.C. Sec. 1304) by characterizing the judgment which will result as "in the nature of a refund." 6 Cl.Ct. at 737. Under this theory, the judgment is then payable by DOD from the account which was credited with the revenues collected by the exchanges, or from other appropriated funds used by DOD to fund its morale, welfare and recreational programs.
 
 
 31
 The concept that the judgment is a "refund" is not only a tortured theory, but also ignores the realities of the judgment. The judgment of the Claims Court would require an immediate cut in essential government services to satisfy the retroactive liability, as well as additional appropriations indefinitely into the future to provide essential government services which otherwise must be reduced. It is unlikely that such a major change in financing for, or in the amount of, military support services would have been undertaken by Congress without serious controversy. There was none. Moreover, if the bill were intended to have such an effect, it would have been taken up by appropriate finance and military affairs committees. It was not. Skirting these problems, the Senate Subcommittee on the Handicapped, which reported the bill, inserted a last-minute amendment exempting the military exchanges, and the Senate Report states unequivocally that the exchanges were wholly exempt. See S.Rep. No. 937, 93d Cong., 2nd Sess. 24 (1974). The House floor debate agreed with the Senate's understanding of the scope of the exemption. See 120 Cong.Rec. 35,712 (1974).
 
 
 32
 The 1973 statement submitted on behalf of organizations for the blind, in support of enactment of the 1974 amendments, was limited to the funds of civilian employee groups:The mandatory assignment of vending machine revenue would provide substantial sums of new money for the achievement of the purpose of the Randolph-Sheppard Act without creating any hardships for federal employees. Likewise, the mandatory assignment of this revenue to achieve the purpose of the Randolph-Sheppard Act would place no burden upon the United States Treasury because the funds in question have not been collected by the government. [Emphasis added.]
 
 
 33
 * * *
 
 
 34
 * * *
 
 
 35
 Over a period of several years, unions of federal employees have been increasingly successful in acquiring the possession and use of revenue from vending machines operated on federal property. This has been accomplished by the cooperation and acquiescence of the administrative branch of government through the recognition of de facto "employee welfare committees" and "employee welfare funds."
 
 
 36
 Randolph-Sheppard Act for the Blind Amendments of 1973: Hearings on S.2581 Before the Subcomm. on the Handicapped of the Senate Comm. on Labor and Public Welfare, 93d Cong., 1st Sess. 139 (1973) (statement of representatives of various organizations for the blind).
 
 
 37
 The funds of such employee groups were attractive targets for diversion. No similar motive existed for reaching the earnings of military exchanges. Diversion of that income to state agencies for the blind would make no economic sense. It would simply be robbing Peter to pay Paul, and then appropriating money for Peter to make up for the transfer.
 
 
 38
 The government does not argue here that the Randolph-Sheppard Act does not apply to military bases. There is no question that Congress sought more opportunities for blind vendors on all DOD properties, and other provisions of the 1974 amendments effectively reach DOD.[11] These include expansion of blind opportunities from vending "stands" to vending "facilities," e.g., cafeterias, including rooms with vending machines only; expansion of items to be sold; the granting of a mandatory "priority" in allocating sites rather than merely a "preference" to blind vendors; a requirement for sites for blind vendors in all new or renovated Federal buildings; and, of course, income sharing, which reaches the numerous non-military exchange groups within DOD. At this time, DOD is second only to GSA in implementing the program for the blind both in numbers of sites and in the amount of income turned over to the states for their programs.[12]
 
 
 39
 As initially drafted, that is, before the exemption, the bill amending the Act was so broad that it could be read to cover every vending machine on federal property. The circumstances surrounding insertion of the subsection providing exemptions were not conducive to precision in drafting.[13] The subsection simply appeared in a mark-up of the entire bill put before the January 29, 1974, executive meeting of the Senate Committee on Labor and Public Welfare, Subcommittee on the Handicapped.[14] There was no opportunity for input from other committees or from DOD. The minutes of the meeting, which are in the record, disclose that the sole topic of discussion was the continuing controversy with the Postal workers and other unions over diverting funds from their vending machines and what compromise (such as grandfathering) could be worked out to mollify them.
 
 
 40
 On June 5, 1974, at another executive session, Senator Williams asked the sponsor of the bill, Senator Randolph, to explain it. Senator Randolph said the bill would enable more blind persons to become active so that they would not have to rely on relief or charity. "The moneys that should go to the blind are going to Federal employee unions." He hoped that "an accommodation would be reached with the unions."[15] Senator Dominick asked again "To whom does the income from vending machines now go?" Mr. Robert Humphreys (of the staff) replied, "To the Employee Union Welfare Committees." Since Senator Randolph was the sponsor of the amendments, his explanation and that of the staff cannot be viewed as casual, off-the-cuff comments. The subcommittee was conscientiously restricting itself to reaching only funds of civilian organizations which were being withheld from the Treasury. The compromise worked out with the unions was that the blind would share in the vending machine income earned by private employee groups in exchange for Congress' sanctioning the retention of the balance by such private groups. There was no similar compromise necessary with respect to exchange funds inasmuch as the retention of exchange funds had for years been approved and the exchanges were recognized as official government instrumentalities.[16]
 
 
 41
 On June 17, 1974, the Senate Committee on Labor and Public Welfare issued Senate Report 93-937, which is the principal Congressional report on the 1974 amendments. The Senate Report interprets the exemption to apply to all exchange operated machines:
 
 
 42
 Subsection (d) exempts certain activities from vending machine income assignment. Both military exchange systems and the Veterans Canteen Service operate under specific statutory authority, and are thus, as a matter of policy, excluded.
 
 
 43
 S.Rep. No. 937, supra, at 24.
 
 
 44
 A House version of the bill had been passed as part of H.R. 14225 on May 21, 1974; the Senate version on September 10, 1974. In presenting the conference version to the House for final passage, Mr. Brademas, floor manager of the bill and Chairman of the House Select Education Subcommittee, gave the following explanation of the military exchange exemption:
 
 
 45
 Other provisions of the conference report, Mr. Speaker, address the question of the assignment of vending machine income.
 
 Briefly, this is what the bill would do:
 
 46
 First. One hundred percent of income from machines in direct competition with a vendor, and 50 percent of income from machines not in direct competition shall accrue to blind vendors and their state licensing agencies:
 
 
 47
 Second. At facilities where at least 50 percent of the hours worked are outside normal working hours, 30 percent of income from vending machines shall accrue to the vendors; and
 
 
 48
 Third. Facilities with less than $3,000 annual vending machine income are totally exempt, as are retail military sales outlets and the Veterans Canteen Service.
 
 
 49
 Mr. Speaker, the conferees are confident that these provisions will help blind vendors and adequately protect the rights of the Government and its employees with respect to the availability at all times of vending facilities and the assignment of income.
 
 
 50
 Finally, Mr. Speaker, I would like to congratulate my friend in the other body, Senator Randolph, for his persistence in this matter.
 
 
 51
 Mr. Sikes, Chairman of the House Armed Services Committee, sought explicit confirmation of the extent of that exemption and the following exchange occurred between them:[17]
 
 
 52
 Mr. SIKES. I would like the distinguished subcommittee chairman to verify for the record, that this provision exempts from the revenue-sharing plan all those vending machines which are operated by the military post exchanges, Navy exchanges, officer and enlisted messes, and so forth.
 
 
 53
 As you are aware, the profits from those vending machines are utilized by the services to finance such worthwhile endeavors as the base libraries, the youth activities, the gymnasium, and other sports activities, hobby shops and motion picture programs, ashore and afloat. The servicemen finance these programs themselves through the revenues collected in the retail sales outlet systems as I have mentioned. To require that these revenues be shared might well necessitate the appropriation of additional funds for the defense budget. Since work in the fiscal year 1975 defense appropriations bill has been completed, the effect would be to cut off these needed programs without support.
 
 
 54
 Would the gentleman confirm for me the fact that it is the intent that this paragraph shall not apply to the military services, and that this is in keeping with the language on page 24 of the Senate report [S.Rept. No. 93-937] which is more specific on this issue that [sic] is the conference report?
 
 
 55
 Mr. BRADEMAS. Mr. Speaker, I thank the gentleman from Florida for his fine remarks about this legislation. I am pleased to tell the gentleman that the answer to both his questions is "Yes." [Emphasis added.]
 
 
 56
 120 Cong.Rec. 35,712 (Oct. 16, 1974).
 
 
 57
 Immediately following that exchange, the House passed the bill. It could not be clearer that Congress did not intend to cut back on funds for the military or to make additional appropriations as a result of 1974 Randolph-Sheppard amendments. The exemption for the exchanges was intended by both the Senate and the House to be complete. The Claims Court opined that the colloquy's:
 
 
 58
 significance is further diminished by the fact that it occurred on the House floor several weeks after the Senate passed the legislation and several days after the Senate unanimously agreed to the Conference Report. Clearly, one cannot say that the Senators who voted for the language in issue did so with any understanding of the meaning reflected in this subsequent colloquy.
 
 
 59
 6 Cl.Ct. at 741 (citations omitted). The Claims Court's analysis discounts the Senate's own legislative history. The House was adopting the Senate's understanding not vice versa. In any event, because of a presidential veto, Congress passed the bill again.[18] Mr. Brademas's explanation, confirmed by the colloquy, thus, is a major factor in determining the intent of both houses, as Mr. Brademas was not simply "another member" but the floor manager and chairman of the sponsoring committee whose remarks are entitled to particular weight. See Lindahl v. Office of Personnel Management, 470 U.S. 768, 105 S.Ct. 1620, 84 L.Ed.2d 674 (1985).[19]
 
 
 60
 All legislative history expressly addressing the possible diversion of income from the exchanges indicates that income was to be exempt. The records contain not even a suggestion of cutting funds for essential military services or making up the loss with additional appropriations. The exchanges simply were not to be affected, as the blind organizations themselves represented. The portions of the congressional report, relied on by the Claims Court (and accepted by the dissent) as support for its view, do not, in fact, indicate a contrary purpose. Rather, the portions were deemed supportive to its theory that "within retail sales outlets" must be given a spatial connotation, as a matter of linguistics. Further, Congressional approval of the "model" Marine Corps base was made with reference to providing additional sites for blind vendors, not with reference to income-sharing. The Marine Corps base was not then sharing income generated by exchanges and never has.
 
 HEW's Interpretation of the Exemption
 
 61
 HEW had responsibility for coordinating the administration of the Act among the government agencies and was to draft regulations in consultation with them. There was substantial dispute between HEW and DOD as to the extent of the exemption provided for the military. None of the dispute, however, initially concerned the exemption of military exchanges. HEW agreed these organizations were exempt. Principally the dispute was over an exemption for enlisted and officers' messes (not part of the exchanges). DOD pressed for such an exemption on the basis of the legislative history despite the absence of any language in the statute directed to the messes.
 
 
 62
 HEW vacillated on allowing this exemption. The negotiations between HEW and DOD and the series of proposed HEW draft regulations, as well as correspondence discussed below, confirm that the HEW position that military exchange income was to be diverted to the blind was a change from its original interpretation.
 
 
 63
 That the scope of the military exemption was not "plain" to HEW from the statutory language is evidenced by the various drafts of regulations which HEW considered over a period of two years. One of the first HEW drafts, dated March 20, 1975, read:
 
 
 64
 [T]he provisions of this section shall not apply to income from vending machines under the control of post exchange or ships' stores systems authorized under Title 10, United States Code, or to Department of Defense morale, welfare, and recreation activities or to Department of Defense clubs, messes, civilian restaurant and welfare funds.... [Emphasis added.]
 
 
 65
 This version continued through several drafts. An HEW memorandum dated June 2, 1975, clarified HEW's position with respect to DOD civilian employee funds:
 
 
 66
 However, the latest revision of the proposed regulation proposed by the Department of Health, Education and Welfare (HEW) contains an exemption for these activities in recognition of legislative history (referring to discussions between Mr. Brademas and Mr. Sikes on October 18, 1974). While it is realized that this exemption could be interpreted to include both military and civilian morale, welfare, and recreation activities, HEW officials drafting the implementing regulation stated that such exclusion is not intended to provide relief for civilian nonappropriated fund activities....
 
 
 67
 The latest revision of the proposed regulation is being circulated within HEW with its expected publication in the Federal Register in about 60 days. [Emphasis added.]
 
 
 68
 The proposed regulation was not, however, published and the next version in July, 1975, while continuing the exemption for the exchanges, eliminated the exemption for officer and enlisted messes and civilian groups. This version read:
 
 
 69
 The provisions of this section shall not apply to income from vending machines under the control of post exchange or ships' stores systems authorized under Title 10 of the United States Code....
 
 
 70
 DOD pressed for revision to exclude all vending machines in military base communities. The first suggestion by HEW that the exchange income was not exempt appears to have been made in October, 1975. DOD was continuing at that time to argue that messes and civilian DOD groups on military bases should be excluded. On December 23, 1975, HEW published proposed regulations simply repeating the statutory language with no interpretation of what the language meant. 40 Fed.Reg. 59,408, 59,414 (1975). DOD and HEW continued their negotiations.
 
 
 71
 On April 26, 1976, Congressman Sikes wrote Secretary Matthews of HEW, confirming that the intent of Congress was to exempt the military exchanges, stating: "Although the law was designed to expand opportunities for blind persons, it was not intended to cripple certain Armed Forces morale and welfare activities."
 
 
 72
 At an April 28, 1976, meeting with DOD, HEW personnel proposed defining "vending machine" in the regulations to exclude any "machines from which the revenue accrues to the Federal Government for credit to the Federal Government." HEW verified that the intent of this change was to exempt DOD non-appropriated fund instrumentalities.[20]
 
 DOD then wrote HEW as follows:
 
 73
 The revised wording of Section 1369.1(y) of the proposed regulations furnished to the attendees of the 28 April meeting and your Mr. Shay's explanation that the revised wording is intended to accomplish the purpose of exempting vending machine income of Department of Defense (DOD) nonappropriated fund instrumentalities (NAFIs) from the income-sharing provisions of the Amendments have, of course, greatly eased our concern. Assuming that the provisions of said Section 1369.1(y) are issued as revised, it would appear that the Congressional intent reflected in the 16 October 1974 exchange between Congressman Brademas and Congressman Sikes on the House floor will have been appropriately incorporated in the HEW regulations. [Emphasis added.]
 
 
 74
 On May 11, 1976, Secretary Matthews answered Congressman Sikes' letter, reassuring him that HEW appreciated his clarification of congressional intent with respect to officers and enlisted messes and that HEW was working closely with DOD. No mention was made of HEW's intention to deny exemption to income from exchange vending machines.
 
 
 75
 In June, 1976, Congressman Brademas wrote Congressman Sikes:
 
 
 76
 [T]he problem with the Randolph-Sheppard Act proposed regulations which you recently brought to my attention ... appears to be solved.
 
 
 77
 The Department of Health, Education and Welfare has advised my subcommittee that the interpretation which we agreed upon in our colloquy on the House floor would be adhered to.
 
 
 78
 Needless to say, I am glad that DHEW had decided to follow the intent of Congress in formulating its regulations. [Emphasis added.]
 
 
 79
 However, no regulations "conforming" to the intent of Congress were issued and HEW ceased consultation with DOD.
 
 
 80
 On March 23, 1977, HEW published final regulations which were exhaustive in other details but, with respect to the military exemption, did little more than repeat the statutory language. 42 Fed.Reg. 15,802-17 (1977), now 34 C.F.R. Sec. 395.32 (1985).[21] Interestingly, the preamble to the regulations, in explaining why officers and enlisted messes were not considered exempt, states that the act "limits exemptions from the income sharing requirements to systems authorized under Title 10 of the United States Code...." (Emphasis added.) 42 Fed.Reg. at 15,807. To exclude messes would, HEW stated, require statutory clarification despite their "linkage to Title 10." Id. On the other hand, HEW did exempt (without an explicit statutory basis) stamp vending machine, copy machines, pay telephones, coin-operated game machines, juke boxes and certain NASA and National Park Service concessions, 34 C.F.R. Sec. 395.30 (1985), citing such reasons as "vending that is uniquely supportive of the Postal Service mission," too "significant" a change, probable "Congressional intent," and "not traditionally found in blind operated vending facilities." 42 Fed.Reg. at 15,806.
 
 
 81
 On July 7, 1977, DOD published its own proposed regulations which stated flatly that income sharing did "not apply to: Income from vending machines operated by or for the military exchanges or ships' stores systems." 42 Fed.Reg. 34,895 (1977). The identical provision was included in DOD's final regulations. 43 Fed.Reg. 25,337, 25,341 (June 12, 1978), now 32 C.F.R. Sec. 260.3(i)(3)(i) (1985).
 
 
 82
 The agencies were then at logger-heads. DOD attempted to get clarifying amendments before Congress. As acknowledged in the majority decision of the arbitrators:
 
 
 83
 It should be noted, further, that DOD's inability to convince Congress to pass an amendment making clear the broad nature of the exemption is not helpful in assessing Congressional intention since HEW and its successor, the Department of Education, has, through the Office of Management and Budget, effectively blocked this legislation from being considered by Congress.
 
 
 84
 In 1979, HEW proposed to DOD that the Department of Justice resolve the conflict between the agencies, stating:
 
 
 85
 Since the Department of Health, Education, and Welfare believes that only income generated within retail sales outlets is exempt, we believe that at this time, as suggested at the meeting held by the Office of Management and Budget, this issue of statutory construction is appropriate for referral to the Department of Justice for resolution.
 
 
 86
 However, it was not until the Oklahoma litigation that the matter was referred to the Department of Justice for resolution of the conflicting HEW/DOD interpretations. Justice upheld DOD. HEW acknowledges that it is bound by Justice's ruling and no longer advances its former unpublished interpretation.[22]
 
 
 87
 Under these circumstances, there is no basis for deference to the interpretation by HEW. Internally, HEW has vacillated. Its published regulations have never set forth an interpretation of the statutory language. Its late-adopted private interpretation was never published or given effect. It is bound by Justice's interpretation. And, finally, in the face of Justice's interpretation, which conflicted with HEW's, HEW has found it unnecessary to revise its regulations. This is understandable since HEW's regulations have never done more than repeat the statute.
 
 The Statutory Purpose
 
 88
 The Claims Court looked to the overall purpose of the legislation and concluded that an exemption for the exchanges would leave "little or no opportunity" for blind vendors on DOD installations since the majority of vending machines were operated by the exchanges. That finding is clearly erroneous in view of DOD's large contributions to state agencies for the blind.
 
 
 89
 In any event, the statutory purpose to be considered here is not simply the purpose of the legislation, but the purpose of the exemption. That exemption was designed to keep the financial support of essential services by the exchanges intact so that Congress need not appropriate additional funds. Congress expected the exchange income to continue to supplement essential programs approved by Congress. Senator Randolph, the blind groups, Mr. Brademas, Mr. Sikes, and both chambers of Congress all agreed on this purpose.
 
 IV.
 The Statutory Language
 
 90
 Given the congressional purpose of the exemption, the question becomes whether the language can reasonably be interpreted, as in DOD's regulation, to effectuate that purpose. We conclude that the statutory language has sufficient ambiguity to make DOD's interpretation reasonable.[23]
 
 
 91
 The first phrase which must be looked at is "income from vending machines." "Vending machine income" requires interpretation, as reflected by the definitions of these terms in HEW regulations setting out exclusions for vending machines of various types and at certain of the National Park Service and NASA facilities. 34 C.F.R. Sec. 395.30 (1985). No statutory provision authorizes these exemptions. HEW simply deemed it necessary and within its power to exclude certain categories of vending machine income which came within the literal words of the statute but were not, in HEW's view, within its intended scope.
 
 
 92
 "Within retail sales outlets" is not without some ambiguity. "Within" can mean "a part of" a system as well as "inside" a structure. "Retail sales outlets" need not mean "stores." The military exchanges operate movie theatres and other recreation facilities, which easily fall within the term "retail sales outlets" and are not "stores." Indeed, an area with only vending machines has become a typical "retail sales outlet."
 
 
 93
 TSCB argues that the phrase "within retail sales outlets" is surplusage if DOD's interpretation is accepted.[24] By the same token, the words "under the control" are surplusage under the contrary interpretation. No real significance can be attached to either argument.
 
 
 94
 TSCB also argues that Congress narrowly drafted the exchange exemptions in comparison with the Veterans Canteen Service exemption. However, the Canteen Service does not have retail outlets which generate a surplus to be used for other services. It simply provides articles and services in veterans hospitals and any surplus income is required by statute to be turned in to the Treasury. 38 U.S.C. Sec. 4201. Thus, this difference in exemption language can be explained. In any event, both the Senate and the House said that both were intended to be wholly exempt.
 
 
 95
 This parsing of sentences is a meaningless exercise here. Undoubtedly, in some instances where statutory language has been finely tuned to cover or to exclude, it is important to consider each word and its relationship to others with great care. This statutory provision was not drawn with great care or precision. For example, the reference to the exchanges systems being authorized by Title 10 is erroneous. See supra note 16.
 
 
 96
 We do not have an instance here where the words of an exemption were selected after debate over its scope. Indeed, in light of the legislative history, had no exemption been specifically granted, an interpretation by regulation to exclude the military exchanges from the definition of "vending machine income"--which HEW has concluded is proper for other agencies--would appear appropriate. The language selected to insure that the military exchanges were unquestionably exempt "represents an instance of inartful drafting rather than the intentional drawing of a subtle distinction." Exxon Corp. v. Hunt, --- U.S. ----, 106 S.Ct. 1103, 1113, 89 L.Ed.2d 364 (1986).
 
 V.
 
 97
 "An agency's construction of a statute it is charged with enforcing is entitled to deference if it is reasonable and not in conflict with the expressed intent of Congress." United States v. Riverside Bayview Homes, Inc., 106 S.Ct. at 461. After considering the ambiguities in the statutory language, the legislative history supporting DOD's position, the purpose of the exemption, and the status of the military exchanges as non-appropriated fund instrumentalities performing essential government services, we are convinced that DOD's regulation is reasonable and is not in conflict with the intent of Congress as expressed in the statute. For the foregoing reasons, we agree with the 10th Circuit that DOD's regulation is not void. The judgment of the Claims Court is reversed.[25]
 
 
 98
 REVERSED.
 
 
 99
 DAVIS, Circuit Judge, with whom MARKEY, Chief Judge, and FRIEDMAN, Circuit Judge, join, concurring in the result.
 
 
 100
 This case presents, in acute form, the recurrent problem of the tension between statutory language and legislative history. I write separately because, for me, the plurality opinion overstresses the alleged "ambiguity" of the statute, while the dissenters underplay the role of the legislative history. My general position is that pertinent legislative history is never wholly irrelevant in the construction of a statute but that the interrelationship of that history with the statutory text follows a continuous spectrum measuring the strength of the language, on the one hand, and the strength of the history, on the other. The more compelling and definitive the words are, the less controlling the legislative history; conversely, the less compelling and definite the language, the more controlling the history to the extent of its strength.[1] In this particular instance, my judgment is that Congress' words can permissibly accommodate a certain degree of breadth which is required by the very strong legislative history.
 
 
 101
 I start with the statutory words. If there were no pertinent legislative history (or if it were amorphous or weak) I would certainly adopt the appellees' reading. To me, the normal meaning of section 107d-3(d) (exempting "income from vending machines within the retail sales outlets under the control of exchange or ships' stores systems authorized by title 10"') (emphasis added) covers only vending machines within post exchange stores (or perhaps immediately outside and adjacent to those facilities). However, that wording is not as precise or as definite as if the statute reached only vending machines "inside" exchange stores or ships' stores; rather, the words Congress actually used--"within the retail sales outlets under the control of [military] exchange ... systems " (emphasis added)--can have a wider reach and potentially be read, without necessarily turning white into black, as including all vending machines operated by the military exchange systems. As I have said, I would not take that course unless the legislative history compelled (or very strongly supported) that broader interpretation.
 
 
 102
 I agree with the plurality's view of the statute because, as I see it, the germane legislative history is very strong and points directly to the wider construction. The colloquy, on the floor of the House of Representatives, between Congressman Brademas and Congressman Sikes[2] inescapably states that all vending machines operated by the military exchanges are exempt from the income sharing provision. This colloquy was not simply a floor exchange between two individual, ordinary members of the House. Congressman Brademas was Chairman of the House Select Education Subcommittee and floor manager of the very bill containing the disputed language; Congressman Sikes was Chairman of the House Armed Services Committee, obviously interested in the military exchange systems. Each spoke in that official capacity, and I think their joint views represented the position of their two committees. As the plurality opinion points out, the bill was passed by both Houses of Congress after the Sikes-Brademas colloquy. To me there is very little doubt that the colloquy had a primary role in the enacting of this amendment to the Randolph-Sheppard Act--equivalent in essence to a formal statement in a committee report. In fact Congressman Brademas referred (in June 1976 at the time the Department of Health, Education and Welfare was drafting its regulations) to the Sikes-Brademas exchange as representing "the intent of Congress" (see plurality opinion, supra, p. 413). There is nothing in the remainder of the legislative history which contradicts or conflicts with the Sikes-Brademas colloquy; on the contrary, the relevant part of the Senate Report (S.Rep. No. 937, 93rd Cong., 2d Sess. 24 (1974) ) seems in its generality to exempt all vending machines operated by military exchange systems. The sum of it, for me, is that the significant legislators concerned with the precise question before us deliberately and knowingly chose the military version of the meaning of the disputed phase.
 
 
 103
 I add, however, that I disassociate myself from the emphasis in the plurality opinion on the position of the Department of Justice as relevant to this interpretive issue. As the main dissent points out, the statute expressly gives to the Department of Health, Education and Welfare (now Health and Human Services (HHS) ) the power to promulgate regulations necessary to assure compliance with the provision before us (20 U.S.C. Sec. 107d-3(g) )--not to the Department of Justice or to the Department of Defense. The fact is, though, that the current HHS regulations are of no help because they do not deal at all with the dispute we are asked to resolve; an internal or unpublished HHS position (not promulgated in a regulation) does not have the status of a proper regulation, and need not be considered. In a word, there is now no regulation of which account should be taken in construing the statute.
 
 
 104
 SMITH, Circuit Judge, with whom NEWMAN, Circuit Judge, joins, dissenting.
 
 
 105
 I respectfully dissent.
 
 
 106
 The purpose of the Randolph-Sheppard Act is to create employment opportunities for the blind by requiring a priority for blind vending stands on all federal property. The priority is achieved and protected by requiring that income from vending machines operated by competitors must be shared with the blind vendors.
 
 
 107
 At issue in this appeal is the meaning of the exemption from income sharing for "vending machines within retail sales outlets under the control of exchange or ships' stores systems."[1] Also at issue are two conflicting approaches to statutory construction.
 
 
 108
 A substantial portion of the majority analysis is based on the silence of Congress with respect to military exchange appropriations. The majority also relies on a colloquy which took place on the House floor when a quorum was not present. On this tenuous basis, the majority established "congressional purpose" in the face of the admittedly clear language of the statute.
 
 Plain Meaning of Statute
 
 109
 I can see nothing ambiguous or superfluous in the statutory exemption for "income from vending machines within retail sales outlets under the control of exchange or ships' stores systems." HEW, GAO, the arbitration panel, and the Claims Court reached the only possible conclusion when they decided that vending machines which are not within such retail sales outlets are not exempt from income sharing.
 
 
 110
 The majority, at the urging of DOD, has rewritten the statute by deleting the words "within retail sales outlets" from Congress' own language. The statutory exemption, as rewritten by the majority, now reads: "income from vending machines under the control of exchange or ships' stores systems." Only after rewriting the statute is it possible to conclude that the exemption covers all vending machines operated by the military exchanges, without regard to the machines' location.
 
 
 111
 The word "ambiguity" has been defined as "uncertainty of meaning" or "admitting of two or more meanings."[2] As for "uncertainty of meaning," it is not difficult to understand "within retail sales outlets" as having the certain meaning "inside the four walls of an exchange system store" (commonly known as "the PX").[3] As for "admitting of two or more meanings," the majority never reveals what other meaning "within retail sales outlets" has.[4]
 
 
 112
 Contrary to the majority's assertion, the Tenth Circuit did not hold or even imply that the statute was at all ambiguous. The Tenth Circuit stated in Oklahoma v. Weinberger:[5]
 
 
 113
 We agree with DHS [Department of Health and Services of the State of Oklahoma] that a literal reading of the exception limits the exception from revenue sharing only to "vending machines within retail sales outlets under the control of exchange or ships' store systems." * * * [Emphasis in original.]
 
 
 114
 Similarly, the district court in Oklahoma found that "[r]ejection of the 'plain meaning' of the exemption" was necessary because:[6]
 
 
 115
 Following the literal meaning of the words would, in this case, compel concurrence with the plaintiff's position as "vending machines within retail sales outlets" would appear to refer to machines within an exchange store. * * *
 
 
 116
 Rather, the rationale of the Tenth Circuit and the Western District of Oklahoma was that:[7]
 
 
 117
 a court has "some [']scope for adopting a restricted rather than a literal or usual meaning of its words where acceptance of that meaning would lead to absurd results ... or would thwart the obvious purpose of the statute[.'] ..." * * *
 
 
 118
 I agree with the Tenth Circuit that the statute is unambiguous. But notwithstanding my great respect for the Tenth Circuit, I cannot agree that the literal meaning of the words would lead to "absurd results" or "thwart the obvious purpose of the statute."[8]
 
 
 119
 A. Clear, Customary Meaning.
 
 Section 107d-3(d) states:[9]
 
 120
 (d) Income from vending machines in certain locations excepted
 
 
 121
 Subsections (a) and (b)(1) of this section shall not apply to income from vending machines within retail sales outlets under the control of exchange or ships' stores systems authorized by title 10, or to income from vending machines operated by the [V]eterans Canteen Service * * *.
 
 
 122
 This section creates distinct exemptions: one for the exchange systems and another for the veterans canteen service.
 
 
 123
 The exemption provided for the exchange systems, unlike the one provided for the canteen system, contains two phrases of modification. Not only must the machines be "under the control of" the exchange system, the machines must also be "within [its] retail sales outlets." As the Claims Court correctly determined, the plain and customary meaning of the word "within" clearly connotes spatial boundaries.[10] The common usage of the word "within" is "to indicate enclosure or containment."[11] Thus, as the majority concedes, the customary meaning of "within retail sales outlets" is "physically within the walls of a store."
 
 
 124
 DOD argues that "within" implies more than just "contained in" and that the exemption protects all machines operated by the military exchanges.[12] DOD contends that "within" can mean something other than spatial proximity--for example when used to mean "within the law."[13]
 
 
 125
 In the context of section 107d-3(d), DOD's interpretation would require this court to hold that "within" really means "within and without." DOD's interpretation completely reads out of the statute the phrase "within retail sales outlets." Basic principles of statutory construction require that effect should be given to every word of the statute so that no part will be rendered meaningless.[14] The two distinct phrases of modification in the statute clearly suggest that vending machines must be more than "under the control of" the military exchanges. The machines must also be "within [a] retail sales outlet."
 
 
 126
 No definition for "within" urged by DOD makes sense when read in the context of section 107d-3(d). If Congress had simply meant "under the control of" the military exchanges, it would not have included the phrase "within retail sales outlets" in the statute at all. DOD considers the word "within" in isolation and discusses the almost metaphorical meanings that it can take on in other contexts. As this court has recently explained, statutory words "cannot be considered in a vacuum. We sit to interpret a statute, not a word."[15]
 
 
 127
 The majority also accepts DOD's argument that the phrase "retail sales outlet" can describe "a cluster of vending machines or even a single vending machine" and that the statute, thereby, exempts all machines. The first error in this strained interpretation is that it is contrary to the accepted meaning of the word "outlet." The term outlet has a common, everyday meaning of "a market for a commodity" or "a retail store."[16] It is well settled that unless Congress has clearly indicated a contrary meaning, a word's customary, everyday meaning is favored.[17]
 
 
 128
 A second problem with DOD's construction of the phrase "retail sales outlet" is that, in context, it makes the statute meaningless. By equating a vending machine with a "retail sales outlet," DOD construes the statute to exempt "income from vending machines within vending machines." Such a bootstrapped definition would read all meaning out of the exemption. The Claims Court reached the correct interpretation by accounting for all of the words in the statute, without nullifying any of its terms.
 
 
 129
 B. Veterans Canteen Service Exemption.
 
 
 130
 DOD's construction of the statute is as follows:The literal words of the statute may fairly be read as exempting from income sharing any vending machine that is a part of ["within"] a network of sales facilities ["retail sales outlets"] operated by or for a military exchange. * * * [Emphasis supplied.]
 
 
 131
 Thus, DOD is really arguing to be treated like the veterans canteen service. Section 107d-3(d) specifically exempts "vending machines operated by the Veterans Canteen Service" (emphasis supplied). The wording of the exemption for the canteen service proves two things. First, Congress knew how to draft the exact exemption that DOD wants, because it did so in the very next clause. Second, this exemption proves that Congress only wanted to provide this broad exemption (encompassing all machines, regardless of location) to the veterans canteen service.[18]
 
 Legislative History
 
 132
 Where the words of a statute are clear, there is no need to review the legislative history.[19] A corollary is that the legislative history cannot be used to create ambiguity where there is none in the statute.[20]
 
 
 133
 The majority has placed great reliance on excerpts from the legislative history; however, other portions of the same reports give a clear indication that Congress fully addressed a much broader problem than that spotlighted by the majority. In addressing that part of the majority opinion, the words of our predecessor court, the Court of Customs and Patent Appeals, give us guidance:[21]
 
 
 134
 We have dwelt at some length upon this phase of the case not because we regard the statute as ambiguous, because we do not so regard it, but out of respect for the views of those who think otherwise. Even if we be in error as to this, however, we do not regard such legislative history as has been cited here controlling.
 
 
 135
 A. Purpose of the Act.
 
 
 136
 The majority unacceptably narrows the purpose of the act by focusing only on "civilian employee groups." Thus, the majority ignores Congress' language reaching "all Federal property," including DOD and military bases in particular.
 
 
 137
 Notwithstanding the appeal of arguments made on behalf of the military, the Randolph-Sheppard Act is primarily legislation in support of the blind. The primary purpose of Congress was to create a 2pronged approach to establish a priority for blind vendors. First, Congress ordered that one or more blind vending stands must be placed on all federal property.[22] Congress recognized, however, that since 1936 the act had already required a "preference" for blind vending stands on all federal property. The act had been unsuccessful because of competition from vending machines:[23]
 
 
 138
 Blind vendors collectively have been confronted with obstacles at virtually every turn. Competition from automatic vending machines has increasingly threatened to suffocate the blind vendor program. * * *
 
 
 139
 The act had been amended in 1954 to require the assignment of vending machine income to blind vendors, where vending machines were in direct competition with the blind:
 
 
 140
 The provision was believed necessary due to the unanticipated growth of automatic vending machines on Federal property, which were beginning to affect blind vendor operations. Unfortunately, that language did not have the desired effect of protecting the livelihood of blind vendors. On the contrary, in the intervening twenty years since the enactment of the provision, the automatic vending machine has been vastly improved, the kinds of food and other merchandise sold through such machines have greatly expanded, and the numbers of machines on Federal property have grown exponentially. Not only has the existing language failed to protect the blind vendor, in many cases the language has been disregarded, and vending machines now constitute a major threat both to the livelihood of individual blind licensees and to the growth of the program as a whole.
 
 
 141
 The existing law in 1974 already required a preference for blind vendors on military bases. Yet there were only 46 blind vending stands on 490 military bases.[24] Congress was forced to take decisive action to achieve its stated goal of one or more blind vendors on every military base.
 
 
 142
 Thus, Congress created the second prong, called "income sharing" to "achieve and protect" the priority for blind vendors.[25] Income sharing was enacted to prevent competitors from driving blind vendors out of business. A competitor who placed vending machines at the same location as the blind vendor was required to assign 100 percent of the vending machine net income to the blind vendor.[26]
 
 
 143
 Similarly, the competitor could not continue to block the placement of a blind vending stand. Even if the competitor succeeded at keeping the blind vendor off the federal property altogether, the competitor was still required to share 50 percent of the vending machine net income with state blind associations.[27]
 
 
 144
 Congress designed income sharing to "remedy the evil" of vending machine competition facing blind vendors.[28] The two prongs of Congress' approach go hand-in-hand. The admitted priority for blind vendors on military bases simply cannot be "achieve[d] and protect[ed]"[29] without the income-sharing provisions of the act.
 
 
 145
 There can be no doubt that Congress specifically targeted the "evil" of DOD abuses of the Randolph-Sheppard Act when it enacted the 1974 amendments:[30]
 
 
 146
 Commanders of military installations are singularly insensitive to the need to develop the program. The vast Defense establishment can report only 9 blind vendors at Air Force facilities, 17 on Army posts, and 16 at Navy bases. The parent Defense Department association at a major Federal space installation demanded that blind vendors give a portion of their income to the association-- precisely the reverse of what should be taking place on Federal property. * * * It can be concluded from this and other evidence that there are widespread, major abuses of blind vendors and of the Randolph-Sheppard program. It is the firm resolve of the Committee that such abuses must cease. [Emphasis supplied.]
 
 
 147
 * * *
 
 
 148
 * * *
 
 
 149
 Very few blind vendors are to be found at military installations. Witnesses before the Committee have stated that each military post or base commander is in charge of his particular installation, and that, for the most part, commanders are either hostile or indifferent to the Randolph-Sheppard program. This attitude has severely curtailed the growth of the program within the Defense Department. Lt. General Leo Benade, the department's witness in the hearings on S. 2581, recognized the deficiencies. He said:
 
 
 150
 "I do not think the military departments ... are insensitive, but I am not very proud of our record, and I think we can do better, and we will."
 
 
 151
 The majority concedes that one or more blind vending stands must be placed on every military base, but the majority takes the teeth out of the statute by recognizing only the first prong (priority for blind vendors on every base) and not the second prong (income sharing "to achieve and protect such priority").[31]
 
 
 152
 B. Sound and Meaningful Distinction.
 
 
 153
 DOD argues that the interpretation arrived at by the Claims Court leads to an "absurd result" because it
 
 
 154
 creates a distinction--between machines physically located inside the four walls of retail stores and machines in other locations--that cannot be justified by reference to any logical policy * * *.
 
 
 155
 Although this contention is stated emphatically, DOD offers no argument or reasons to back it up.
 
 
 156
 The distinction between machines within retail stores and those in other locations appears to be consistent with Congress' goals and of the compromise struck between the exchange system and the blind. Congress exempted from the income-sharing provisions the revenue from machines located within the exchanges, thereby allowing the exchanges to sell within the store, by machine, whatever they could sell ordinarily. Thus, a blind vendor could not claim that, because an exchange store was selling cigarettes or drinks from a machine rather than by a human, he was entitled to share the income. On the other hand, the exemption does not allow the exchanges to nullify the priority for blind vendors by placing competing vending machines over the entire base.
 
 
 157
 It is DOD's interpretation that leads to a result plainly at variance with the purpose of the statute, because the interpretation would grant DOD the power to completely circumvent the act. DOD regulations expressly deny the priority for blind vendors with respect to vending machines operated by the exchange system.[32] Thus, if DOD's interpretation prevails, it could keep all blind vendors off military bases by ruling that a blind vendor would be competing with a machine operated by the exchange system. This self-appointed power was pointed out to Congress by GAO and it formed a basis for the narrow compromise exemption.[33]
 
 
 158
 C. Congress' Silence on PX Appropriations.
 
 
 159
 One of the consequences of the Randolph-Sheppard Act is that military exchanges are subject to income sharing from vending machines outside the PX stores. The cost of compliance with the act would be less than 4 percent of the exchanges' total annual income.[34] The act is completely silent about additional appropriations for the military exchanges to make up for the income sharing. This is not surprising, since this particular act was intended to help the blind; its primary purpose was not to help soldiers and sailors.
 
 
 160
 The majority, however, attaches great significance to Congress' silence. Under the majority's view, it is not sufficient for Congress to require the military exchanges to share income with the blind. Congress also must demonstrate that it has considered whether additional appropriations will be necessary for the military exchanges.[35]
 
 
 161
 The Supreme Court has warned of the danger in the majority's approach: "[t]he search for significance in the silence of Congress is too often the pursuit of a mirage."[36] In still another case, the Supreme Court stated:[37]
 
 
 162
 [I]t would be a strange canon of statutory construction that would require Congress to state in committee reports or elsewhere in its deliberations that which is obvious on the face of a statute. In ascertaining the meaning of a statute, a court cannot, in the manner of Sherlock Holmes, pursue the theory of the dog that did not bark. [Citation omitted.]
 
 
 163
 The Supreme Court "has never insisted that a legislative body articulate its reasons for enacting a statute."[38] Thus, it is not a function of the courts to "presume that 'Congress was unaware of what it accomplished....' "[39]
 
 
 164
 Congress was not obliged to discuss military PX appropriations in this statute related to the blind vending program. The majority errs in pursuing "the theory of the dog that did not bark."
 
 
 165
 The majority's reliance on PX appropriations in other legislation totally unconnected to the Randolph-Sheppard Act is too remote to be relevant in discerning legislative intent in the present act.[40]
 
 
 166
 D. Colloquy on the House Floor.
 
 
 167
 Historically, the courts have been extremely reluctant to consider statements made by legislators during floor debate. In the landmark case of Aldridge v. Williams,[41] the Supreme Court held:
 
 
 168
 In expounding this law, the judgment of the court cannot, in any degree, be influenced by the construction placed upon it by individual members of Congress in the debate which took place on its passage, nor by the motives or reasons assigned by them for supporting or opposing amendments that were offered. The law as it passed is the will of the majority in both houses, and the only mode in which that will is spoken is in the act itself; and we must gather their intention from the language there used * * *.
 
 
 169
 Explanatory statements made by the committeeman in charge of the bill when presenting it for passage have been used as an "aid to the interpretation of a statute where its language is doubtful or obscure."[42] "But while they may be looked at to explain doubtful expressions, not even formal reports--much less the language of a member of a Committee--can be resorted to for the purpose of construing a statute contrary to its plain terms."[43]
 
 
 170
 The Supreme Court again explained the limits on the use of statements by the committeeman in charge of the bill:[44]
 
 
 171
 [W]hen taking the act as a whole, the effect of the language used is clear to the court, extraneous aid like this can not control the interpretation. [Citations omitted.] Such aids are only admissible to solve doubt and not to create it. * * *
 
 
 172
 It is impossible to discover the "intention of Congress" from remarks made by individual legislators on the congressional floor.[45] The safest guide to congressional intent is found in the words employed by Congress in the statute.[46]
 
 Judge Skelly Wright has stated:[47]
 
 173
 [Q]uotes from legislative floor debate do not persuade us to deviate from the statute's clear language. * * *
 
 
 174
 * * * [T]he significance of such comments from legislative floor debates is limited, not only because of such clear statutory language, but also because "[t]he remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history. * * * " [Citation omitted.]
 
 
 175
 As our predecessor, the Court of Claims, has cautioned:[48]
 
 
 176
 Congress may be presumed not unskilled in the use of words and highly likely to have enacted what it intended. It is foolish to abandon this presumption where the legislative history is perceivably full of pitfalls that cannot readily be avoided. Some pitfalls are invisible to the judicial eye, but the most myopic can see one in a committee report that contradicts the plain language of a statute in guise of interpreting it, or makes manifestly incorrect statements about it or what it does. * * *
 
 
 177
 The "judicial eye" must see that there are pitfalls in resorting to floor debate which "contradicts the plain language of a statute in guise of interpreting it." Indeed, a member of Congress has warned us that legislators may enter into a "friendly colloquy" in the hope that the courts will accept their language instead of the plain language of the statute:[49]
 
 
 178
 Mindful of this judicial scrutiny, legislators of today have used the opportunity of debate to achieve legislative goals which might otherwise be unattainable. Indeed, by the use of the "friendly colloquy," two men may be able to legislate more effectively than all of Congress.
 
 
 179
 This type of colloquy is presented in the form of a friendly exchange of questions and answers about the pending legislation between members, one of whom is usually a member of the committee from which the legislation emanated. This seeming repartee is not accidental. In fact it is just the opposite. It has been carefully planned by the parties for the express purpose of providing a legislative interpretation of a statutory provision which might otherwise be differently interpreted.
 
 
 180
 Turning now to the colloquy relied upon by the majority, it can be seen that under the "guise of interpret[ation]" Congressman Sikes "contradicts the plain language of the statute" and makes "manifestly incorrect statements about it or what it does."[50] Sikes quotes the statutory language limiting the exemption to "vending machines 'within the retail sales outlets,' " and then in the next sentence "presume[s] * * * that this provision exempts from the revenue-sharing plan all those vending machines which are operated by the military post exchanges * * * and so forth."[51] (Emphasis supplied.) He continued by stating that the income-sharing provisions "shall not apply to the military services " (emphasis supplied), a statement so clearly erroneous that even DOD acknowledges that the exemption is not so broad as Sikes claimed. Sikes also indicated his concern for the funding of the "worthwhile endeavors" of the military exchange program, stating his belief that additional appropriations for that year would be impossible.
 
 
 181
 The majority opinion would give legislative effect to the overbroad statements of one member of Congress by means of the terse answer "yes" given by another member. The classic response to this is that a shorter and more accurate answer by the second gentleman would have been "no."
 
 
 182
 Perhaps the greatest danger in rewriting the statute on the basis of this colloquy, not addressed in the majority opinion, is that there was not a quorum present when the colloquy took place.[52] Thus, the "two men [were] able to legislate more effectively than all of Congress."[53]
 
 
 183
 With apologies to Gilbert and Sullivan,[54] it may be observed that:
 
 
 184
 "Things are seldom what they seem
 
 
 185
 Skim milk masquerades as cream."
 
 Two and two aren't always four
 In dialogue upon the floor
 
 186
 Of any legislative forum,
 
 
 187
 In the absence of a quorum.
 
 
 188
 This circumstance may be revised,
 
 
 189
 Now all debates are televised.
 
 
 190
 Attendance now, so we envision,
 
 
 191
 Will improve with television.
 
 
 192
 I have no doubt that Congressman Sikes was sincere in his concern for the welfare of the military exchanges; indeed, I would expect such concern from the Chairman of the House Armed Services Committee. Nor do I question the authority of Congress to enact a statute such as Sikes would have preferred.
 
 
 193
 There is no doubt that if Sikes had been successful in amending the bill to delete the words "within retail sales outlets," and if Congress had passed such a bill, this court would give effect to the resulting statute. The only hitch is that the bill was not amended to delete the language to which Sikes objected.
 
 
 194
 DOD comes to this court asking us to give effect to the language of Congressman Sikes (before less than a quorum of 1 house) rather than the language of the statute enacted by Congress. This we cannot do under the precedent of the Supreme Court and our predecessor courts. "Even assuming, for the time being," that it would make more "economic sense" to exempt all vending machines instead of only those machines "within retail sales outlets":[55]
 
 
 195
 [W]e would only be left with the fact that Congress could have promulgated a better and more meaningful statute. Nevertheless, to improve legislation is certainly not the function or responsibility of the court. "[O]ur problem is to construe what Congress has written. After all, Congress expresses its purpose by words. It is for us to ascertain--neither to add nor to subtract, neither to delete nor to distort". * * *"Since Congress thought there was a reason"[56] to grant an exemption for vending machines "within retail sales outlets," but not for vending machines in other locations, "we cannot say otherwise."[57]
 
 
 196
 The Court of Claims further stated in Ricker:[58]
 
 
 197
 Defendant would have us delete or ignore the clear language of the statute. We must adhere to the rule stated in Prudential Ins. Co. of America v. United States * * *: "It is fundamental that an unambiguous statute should be given effect according to its plain and obvious meaning". [Citation omitted.]
 
 
 198
 It is not within the power of this court to rewrite the Randolph-Sheppard Amendments of 1974 under the rationale of "no economic sense."
 
 
 199
 I would give effect to the words employed by Congress. The exemption from income sharing applies to "vending machines within retail sales outlets under the control of exchange or ships' stores systems." All other vending machines under the control of the exchange systems are subject to income sharing, as provided by the Randolph-Sheppard Act.[59]
 
 
 200
 E. Subsequent Letters from Congressmen.
 
 
 201
 The majority errs in relying on letters, written by individual congressmen subsequent to the bill's enactment, as evidence of "the intent of Congress."[60] As the Court of Claims has stated:[61]
 
 
 202
 How [a congressman] could possibly have "personal knowledge of the object or intention of the enactment" by both Houses of Congress is not easy to comprehend. At most he could have only personal knowledge of his own object and intention, and that would not go far towards showing the object and intention of each, or of a majority of the several hundred members of the House of Representatives and of the members of the Senate in passing the act, * * *.
 
 
 203
 Furthermore, if subsequent interpretations were relevant, the 1979 Oversight Hearings indicate that Congress enacted exactly the words it intended in the 1974 statutory exemption. Senator Randolph, the author of the act, was highly critical of DOD's noncompliance with both the act and the HEW regulation concerning vending machine income sharing.[62]
 
 
 204
 Just as the colloquy was ineffective to amend the language of the bill, the subsequent letters were ineffective to amend the language of the statute.
 
 
 205
 In sum, the legislative history of the act reveals its sweeping purpose to combat the "widespread, major abuses" of the blind vendor program and to double the number of blind vendors on all federal property. DOD alone was characterized as "singularly insensitive" and "hostile or indifferent" to the program. DOD was criticized not only for its abuses of blind vending stands but specifically for the military exchanges' use of vending machines to compete with blind vendors.[63] The amendments were adopted to protect the blind from the military exchanges and not vice versa.HEW Interpretation
 
 
 206
 Congress expressly stated its desire and reason for regulatory supremacy in HEW:[64]
 
 
 207
 The Committee finds that there is a record of abuses and neglect of the Randolph-Sheppard program by officials of various Federal agencies that is adequate to justify the placement of increased overall authority for its operation with the Secretary of Health, Education, and Welfare. * * *
 
 
 208
 * * *
 
 
 209
 * * *
 
 
 210
 The Committee believes that the Department of Health, Education, and Welfare should be the overseer of the Randolph-Sheppard program throughout the Federal government. As such, it is inevitable that there will be some incursion by that department in matters traditionally handled by other agencies. The Department of Health, Education, and Welfare, however, has the expertness and the sensitivity to the problems inherent in the blind vendor program which may be lacking in other agencies. If the program is to be coordinated, well run and consistent, it must have a coordinator. The only possible choice for this function is HEW.
 
 
 211
 Congress acted on the committee's recommendations by granting both broad and specific powers to HEW alone. Thus, HEW shall prescribe regulations to assure the priority for blind vendors (including income sharing "to achieve and protect such priority").[65] HEW shall prescribe regulations establishing one or more vending facilities on all federal property.[66] "A determination made by the Secretary [of HEW ] pursuant to this provision shall be binding on any department, agency, or instrumentality of the United States affected by such determination."[67]
 
 
 212
 HEW shall "make annual surveys of concession vending opportunities for blind persons * * * particularly with respect to * * * the Department of Defense."[68] HEW shall convene arbitration panels to decide disputes under the Randolph-Sheppard Act.[69]
 
 Finally, and most significantly:[70]
 
 213
 The Secretary [of HEW ] shall take such action and promulgate such regulations as he deems necessary to assure compliance with this section [concerning vending machine income sharing].
 
 
 214
 Given the statute and the express statements of Congress, the majority's conclusion that HEW is "only on a par with DOD" in promulgating regulations under the act is surprising, to say the least.
 
 
 215
 For two reasons, the majority misplaces its reliance on Executive Order No. 12,146,[71] which only states that if two executive agencies disagree on the interpretation of a statute, they may submit the dispute to the Attorney General "prior to proceeding in any court" (emphasis supplied). First, the Department of Justice is not allowed to issue a ruling on a matter already in litigation.[72]
 
 
 216
 Thus, in Oklahoma v. Weinberger,[73] the Department of Justice was not functioning in the neutral position that the Tenth Circuit assumed. As the letter upon which DOD bases its argument clearly states, the issue reached the Department of Justice only after suit was filed in Oklahoma. The Department of Justice was already functioning as the Government's lawyer in response to pending litigation against the United States. The Department of Justice was merely advising its client not to take any action that would compromise the litigation in progress. The Department of Justice thus issued no formal opinion, nor could it have under federal law, because the matter was under litigation.
 
 
 217
 The majority errs in stating that Justice's interpretation in litigation is binding. The United States is always a party in the Claims Court, where it is represented by the Department of Justice. Under the majority's analysis, the Department of Justice could issue a binding ruling in every case, and there would be no need for a Claims Court.
 
 
 218
 Second, it is inaccurate for the majority to suggest that conflicting regulations of two agencies are entitled to equal weight, without regard to the statutory authority of the agencies. Here, the respective authority of HEW and DOD can be determined only in reference to the act, which overwhelmingly rejects the majority's assertion that the agencies are "only on a par."
 
 
 219
 The majority criticizes the HEW regulation because it merely "repeat[s] the statutory language." In my view, a better basis for disregarding a regulation of the authorized agency would be if the agency did not follow the statute.[74] Furthermore, the fact that HEW did not find it necessary to depart from the statutory language, stating that only an amendment by Congress could effect such a change, is a powerful indication that the statute was clear and unambiguous.
 
 
 220
 The majority states that "there is no basis for deference to the interpretation by HEW" because HEW has "vacillated internally." A close reading of the majority opinion, however, discloses the fact that HEW published its final regulation on March 23, 1977, and HEW has never changed or withdrawn this regulation.
 
 
 221
 Advocates for DOD wrote letters attempting to prevail upon HEW to change its regulation. It is this flurry of correspondence which the majority describes as evidence of "internal vacillation." If the correspondence proves anything, it is that HEW carefully considered the views of DOD as well as the language of the statute before it promulgated its regulations. This initial correspondence was never promulgated or published, but even if it had been, it would not be sufficient to undermine HEW's credibility. The United States Supreme Court has recently explained:[75]
 
 
 222
 The fact that the agency has from time to time changed its interpretation of the term "source" does not, as respondents argue, lead us to conclude that no deference should be accorded the agency's interpretation of the statute. An initial agency interpretation is not instantly carved in stone. On the contrary, the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis. * * *
 
 
 223
 When it became clear to DOD that HEW would not change its regulations, DOD acted upon HEW's advice and attempted to introduce legislation to amend the Randolph-Sheppard Act to delete the words "within retail sales outlets." DOD's legislative proposal was not acted on, however, and the statutory exemption remained unchanged.
 
 
 224
 Undaunted, DOD proceeded to publish its own final regulations exempting all vending machines "operated by or for the military exchanges."[76] DOD acknowledged comments disagreeing with its version of the exemption, but it refused to change the DOD regulation.[77]
 
 
 225
 The majority "conclude[d] that the interpretation of DOD, as the agency compelled to apply the statutory exemption, is the only authoritative administrative construction."[78] Clearly, the majority has erred.
 
 Conclusion
 
 226
 The majority has rewritten a clear statute despite its plain meaning, the legislative history supporting that plain meaning, and the interpretation of the authorized agency. Thus, DOD has accomplished through the courts what it was unable to accomplish in the legislature or in the executive branch.
 
 
 227
 I would affirm the judgment of the United States Claims Court.
 
 
 228
 NEWMAN, Circuit Judge, with whom SMITH, Circuit Judge joins, dissenting.
 
 
 229
 I generally agree with Judge Smith's opinion in dissent, and offer the following additional remarks.
 
 
 230
 Both sides of this issue pose questions that are inappropriate for judicial answer, yet answer we must. The literal words of the statute, on which Judge Smith's opinion turns, are challenged by the fact that DOD has apparently never implemented those words; this in turn is balanced by the contrary reading of the statute by HEW (the agency charged with administering the statute). The 10th Circuit has held one way, and the Texas arbitrators (split 2-1) and the Claims Court held the other way. The legislative history can support both interpretations, as the preceding opinions demonstrate at length.
 
 
 231
 No fundamental law of nations or peoples is at stake; rather, at stake is the choice of Congress on how to aid both the blind and military recreation. This is a decision of national policy, and it cries for the voice of Congress, not a court's conclusion that Congress did not intend the legislation that it enacted.
 
 
 232
 Until that voice is heard, I conclude that the balance is on the side of the position supported by Judge Smith. This result does not require explaining away the plain words of the statute, as is eloquently done by the majority of the court. I find it anomalous to conclude that the House and Senate* believed that the simple clause "within retail sales outlets" really means "anywhere on the base". Although the government has cited precedent for judicial rewrite of acts of Congress, none of this authority goes as far as the dramatic rewrite advanced by the court.
 
 
 
 [1]
 The appeal was originally heard by a panel of this court. Subsequently, one member of the panel retired and the court voted to decide the case in banc. Our jurisdiction rests on 28 U.S.C. Sec. 1295(a)(3) (1982)
 
 
 [2]
 6 Cl.Ct. 730 (1984)
 
 
 [3]
 Comp.Gen.Dec. B-112,840, 32 Comp.Gen. 282 (Dec. 10, 1952). The proposed legislation was never passed
 
 
 [4]
 Oklahoma had filed an arbitration complaint more than a year before. The district court did not require exhaustion of administrative remedies because of the delay and the government's interposing of no objection. Oklahoma v. Weinberger, 582 F.Supp. 293, 294 n. 2 (W.D.Okla.1982)
 
 
 [5]
 We note that the Tenth Circuit, in affirming summary judgment, specifically quoted the district court's finding that the language was "ambiguous." 741 F.2d at 292
 
 
 [6]
 That the Claims Court was incorrect on this point is analyzed infra
 
 
 [7]
 The court quoted from the Senate Report, S.Rep. No. 937, 93rd Cong., 2d Sess 21 (1974), "Subsection (d) provides that the assignment of income provisions of subsections (a) and (b)(1) do not apply to vending machine income from military exchange retail outlets" and a similar passage, S.Rep. No. 937 at 30
 
 
 [8]
 Faced with the 10th Circuit decision, TSCB sought to prevent the government from raising any legal question attacking the merits of the award. TSCB contended that the Claims Court lacked "jurisdiction" to consider such a defense for two reasons: (1) the Act provides for a right to appeal from an arbitration award only specifically in favor of the claimant, and (2) alternatively, the government's challenge should be considered barred by a statute of limitations
 We need not decide whether the U.S. could have taken an appeal from the award. The issue is whether the presence of a specific provision in the Act allowing appeal by the claimant bars the U.S., by implication, from defending against enforcement of the award on the ground that the award is not authorized by statute. As a matter of statutory interpretation, we hold that it does not. With respect to the assertion of a bar based on a statute of limitations, none is applicable here against the United States. United States v. Summerlin, 310 U.S. 414, 416, 60 S.Ct. 1019, 1020, 84 L.Ed. 1283 (1940) (United States is not bound by state statutes of limitations); Guaranty Trust Co. v. United States, 304 U.S. 126, 58 S.Ct. 785, 82 L.Ed. 1224 (1938) (United States is not bound by federal statutes of limitations unless their terms specifically so provide). Finally, TSCB makes no argument that the government is improperly making a collateral attack on the arbitration award. In this connection, we note that the parties agreed before the arbitration panel that "the meaning of the exemption will be finally resolved by the courts." Accordingly, we hold that the Claims Court properly considered the issue of the legality of the award under the statute.
 
 
 [9]
 Some of the legislative history is confusing in that such private organizations of government employees are referred to as "non-appropriated fund instrumentalities" (NAFI). That term has had no single meaning among government agencies. See Study of Procurement Payable From Nonappropriated Funds, August 1976. Cf. L'Enfant Plaza Properties, Inc. v. U.S., 668 F.2d 1211, 229 Ct.Cl. 278 (1982). See also infra note 18
 
 
 [10]
 Review of Vending Operations On Federally Controlled Property, Report to the Subcomm. on the Handicapped, Senate Comm. on Labor and Public Welfare, B-176886 37, 43 (Sept. 27, 1973) (hereinafter "GAO Report "). In addition to civilian employee groups, GAO noted competition from minority-owned businesses which were being favored over blind vendors and privately contracted cafeterias in connection with which vending machines were allowed in order to lower prices in the cafeterias. Id. at 42; see also Letter from General Services Administration to Senator Randolph (Dec. 27, 1973). However, the legislative history makes clear that the activities of civilian employee groups were the primary concern of Congress
 
 
 [11]
 The GAO report as summarized in 6 Cl.Ct. at 732-33 was concerned with the number of blind vendors on DOD facilities, including bases, not with diverting exchange income
 
 
 [12]
 The record shows DOD contributed $784,613 to state blind agencies in 1983; $729,471 in 1981. The dissent errs in its assertion that DOD can somehow keep blind vendors off military bases because of the subject exemption. The exemption has no applicability to the mandatory requirement to provide sites for blind vendors
 
 
 [13]
 See infra note 16 and section IV
 
 
 [14]
 The exemption may have been in response to a brief comment by Lieutenant General Benade of DOD during a 1973 hearing, but contrary to the dissent, there is no evidence of a "compromise" with respect to the military exchanges. Even TSCB does not so assert. All evidence is that the exchanges were to be entirely exempt
 
 
 [15]
 The percentages and the $3,000 exemption became the accommodation finally adopted for these groups
 
 
 [16]
 Technically the exchanges and ships' stores systems are not "authorized by title 10" as stated in the statute, but are established by the Secretary of Defense under general authority to regulate the department. Although there were earlier federal court cases dealing with the exchange activities and their employees, the most significant decision is Standard Oil Company of California v. Johnson, 316 U.S. 481, 485, 62 S.Ct. 1168, 1170, 86 L.Ed. 1611 (1942), in which the Supreme Court stated, "[W]e conclude that post exchanges, as now operated, are arms of the government deemed by it essential for the performance of government functions. They are integral parts of the War Department, share in fulfilling the duties entrusted to it, and partake of whatever immunities it may have under the constitution and federal statutes." The court further stated, "[t]hat the establishment and control of post exchanges have been in accordance with regulations rather than specific statutory directions does not alter their status, for authorized War Department regulations have the force of law." 316 U.S. at 484, 62 S.Ct. at 1169
 This misstatement in the statute is symptomatic of its inherent flaws which must be overlooked to carry out congressional intent.
 
 
 [17]
 The dissent's comments on lack of a quorum are entertaining but legally in error. A quorum was established by a count of the members prior to debate on the conference report. Under House procedures a quorum is deemed present at all times until it is determined by a count of the House on a proper point of order that no quorum is present. Further, a member may make the point of order that no quorum is present whether there is, in fact, a quorum present or not. See VI C. Cannon, Cannon's Precedents of the House of Representatives, 805, 853 (1935). However, the question of a quorum cannot be raised once established by vote until "the Speaker has put the pending motion or proposition to a vote." H.Rep. Rule XV 6(e)(1); see also W. Oleszek, Congressional Procedures and the Policy Process, 125-26 (2d ed. 1984). Thus, during the debate, a quorum was legally present under House rules and the number of members present may, in fact, have constituted a quorum
 
 
 [18]
 Following initial passage, President Ford vetoed the bill, the veto was overridden. However, the President returned the bill to Congress claiming that the veto was a pocket veto (which could not be overriden) and not a return veto. Congress' override was based on the assumption that the veto was a return veto. To eliminate uncertainty, both the House and Senate again passed a bill with the identical military exchange exemption, S.4194, on November 26, 1974. See S.Rep. No. 1297, 93d Cong., 2d Sess 1-2, reprinted in 1974 U.S.Code Cong. & Ad.News 6373-74; See also Kennedy v. Jones, 412 F.Supp. 353 (D.D.C.1976). Thus, contrary to the Claims Court, the Senate passed the exemption after the colloquy in the House
 
 
 [19]
 The dissent errs in discounting Mr. Brademas' statements and the Brademas-Sikes colloquy. As in Lindahl, these were not unreliable comments "just by 'a few congressmen,' but by the sponsor of the legislation [and chairman of the] Subcommittee from which it originated." 105 S.Ct. at 1631
 
 
 [20]
 Unlike other agencies, DOD used this term only for organizations performing approved government services--not civilian employee groups. Under this regulation, it is understood the messes would have been exempt. The question of an implied exemption for messes is not before us
 
 
 [21]
 The regulations added the words "operated" before "within" and "post" before exchanges
 
 
 [22]
 The Claims Court erroneously believed that HEW's interpretation was entitled to more weight than DOD's. While HEW was the coordinator of the program throughout the government, it was only on a par with DOD in an interagency legal dispute before Justice. See Exec. Order No. 12,146, 3 C.F.R. Sec. 409.411 (1980)
 
 
 [23]
 Judge Davis, in his concurrence, more eloquently expresses the interrelationship of the strength of the language, on the one hand, and the strength of legislative history, on the other
 
 
 [24]
 Although not very compelling, DOD's explanation, that the exchanges occasionally make sales which are "wholesale" in nature, at least gives some reason for including the phrase
 
 
 [25]
 The dissent, despite its length, has only one argument: the statutory language is unambiguous. If the slightest ambiguity were to be acknowledged by the dissent, its position crumbles away. In stark contrast, HEW, DOD, Justice, the three arbitrators, the Oklahoma district court and the judges of the Tenth Circuit all found the language subject to various interpretations. If the dissent did not distort the Tenth Circuit opinion on this point, the dissent would have no basis for characterizing our sister circuit's reasoning as "weak."
 
 
 [1]
 I believe my general position does not contravene any established or definitive Supreme Court rule. There are many different variations in Supreme Court opinions on the use of legislative history, but in my understanding no definitive rule has emerged either that there are certain instances in which legislative history should not be considered at all, or that such history should always be taken into account
 
 
 [2]
 This colloquy is set forth in both the plurality opinion and the main dissent
 
 
 [1]
 20 U.S.C. Sec. 107d-3(d) (1982)
 
 
 [2]
 WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 66 (1967)
 
 
 [3]
 Contrary to the majority's implication, a court's act of explaining a statute is not evidence of ambiguity. The very function of the courts is to apply statutes and necessarily to interpret and explain them
 Here, DOD has asserted ambiguity where there is none. We explain the statute at DOD's insistence, and DOD cannot be heard to complain that the very act of explanation which it demands is evidence of ambiguity. If it were so, every statute which a party requires the court to apply would be deemed ambiguous. See 2A N. SINGER, SUTHERLAND STATUTORY CONSTRUCTION Sec. 45.02 (4th ed. 1984).
 
 
 [4]
 The majority concedes that the "common" understanding of "within retail sales outlets" might be physically within the walls of a store, as the Claims Court held. The majority then embarks on an exploration of subjective policy considerations, leaving us in suspense as to what other possible meaning the words could have. When the majority finally returns to the statutory language, it is with the ambivalent statement that " '[w]ithin retail sales outlets' is not without some ambiguity."
 
 
 [5]
 Oklahoma v. Weinberger, 741 F.2d 290, 292 (10th Cir.1983), cert. denied, 466 U.S. 971, 104 S.Ct. 2345, 80 L.Ed.2d 819 (1984)
 
 
 [6]
 Oklahoma v. Weinberger, 582 F.Supp. 293, 294-95 (W.D.Okla.1982), aff'd, 741 F.2d 290 (10th Cir.1983), cert. denied, 466 U.S. 971, 104 S.Ct. 2345, 80 L.Ed.2d 819 (1984)
 
 
 [7]
 Oklahoma, 582 F.Supp. at 295 (quoting Trans Alaska Pipeline Rate Cases, 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978) ); see also Oklahoma, 741 F.2d at 292
 
 
 [8]
 The weakness in the Tenth Circuit's reasoning is that the common meaning of the words does not lead to "absurd results" or "thwart the obvious purpose of the statute." Indeed, the common meaning of the words must be used " 'where no such consequences would follow and where ... [the plain meaning] appears to be consonant with the purposes of the Act....' " Trans Alaska, 436 U.S. at 643, 98 S.Ct. at 2061 (quoting Commissioner v. Brown, 380 U.S. 563, 571, 85 S.Ct. 1162, 1166, 14 L.Ed.2d 75 (1965) )
 
 
 [9]
 20 U.S.C. Sec. 107d-3(d) (1982)
 
 
 [10]
 Texas State Comm'n for the Blind v. United States, 6 Cl.Ct. 730, 738 (1984)
 
 
 [11]
 WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2627 (1967). In Shakespeare's time "within" could also mean "in the control of," but this definition is obsolete. Id
 
 
 [12]
 It is significant to note that the case cited by DOD for this argument adopts the common meaning and defines the word "within" to mean "inside the bounds" and "not without." Town of Alexandria v. Clark County, 231 S.W.2d 622, 624 (Mo.1950)
 
 
 [13]
 Although "within" in that context connotes something other than physical space, it still means "inside the boundaries of" or "contained in." DOD can offer no accepted synonym or use of the word that when read in context with "retail sales outlets" can lead to the result it desires
 
 
 [14]
 Ricker v. United States, 396 F.2d 454, 184 Ct.Cl. 402 (1968); 2A SUTHERLAND Sec. 46.06 (1984); see also Hart v. United States, 585 F.2d 1025, 1035, 218 Ct.Cl. 212 (1978) ("People are entitled to find in the statute books the laws that govern them.")
 
 
 [15]
 United States v. John C. Grimberg Co., 702 F.2d 1362, 1366 (Fed.Cir.1983). The decision in Grimberg hinged on whether "claim" meant a claim filed with the Claims Court or a claim filed with the Government's contracting officer. Grimberg held that the word "claim" had to be read in context, just as the word "within" must be read in context here. Certainly, Grimberg provides no support for the majority to change the meaning of the statute by deleting words from it
 
 
 [16]
 WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1602 (1967)
 
 
 [17]
 Lynch v. Alworth-Stephens Co., 267 U.S. 364, 370, 45 S.Ct. 274, 276, 69 L.Ed.2d 660 (1925) ("the plain, obvious and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover" (quoting lower court opinion, 294 Fed. 194) ); Benton v. United States, 488 F.2d 1017, 1020, 203 Ct.Cl. 263 (1973); Prudential Ins. Co. of America v. United States, 319 F.2d 161, 166, 162 Ct.Cl. 55 (1963)
 
 
 [18]
 The reason for the distinction lies in the nature of the two departments. First, the veterans canteen service is specifically authorized under law and is a direct entity of the Federal Government. 38 U.S.C. Sec. 4201 (1982). Second, the canteen system and the exchanges serve different customers and different ends. The legislative history shows that Congress was well aware of the veterans canteen services' unique legal and factual status. Randolph-Sheppard Act for the Blind Amendments of 1973: Hearings on S. 2581 Before the Subcomm. on the Handicapped of the Senate Comm. on Labor and Public Welfare, 93d Cong., 1 Sess. 26 (1973) (hereinafter cited as 1973 Hearings )
 
 
 [19]
 The majority departs from the path established by the Supreme Court:
 "It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the law-making body which passed it, the sole function of the courts is to enforce it according to its terms. [Citations omitted.]
 "Where the language is plain and admits of no more than one meaning the duty of interpretation does not arise and the rules which are to aid doubtful meanings need no discussion. [Citation omitted.] There is no ambiguity in the terms of this act. * * *
 "Statutory words are uniformly presumed, unless the contrary appears, to be used in their ordinary and usual sense, and with the meaning commonly attributed to them. * * * "
 Caminetti v. United States, 242 U.S. 470, 485-86, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917); see Packard Motor Car Co. v. NLRB, 330 U.S. 485, 492, 67 S.Ct. 789, 793, 91 L.Ed. 1040 (1947); Selman v. United States, 498 F.2d 1354, 1356, 204 Ct.Cl. 675 (1974).
 
 
 [20]
 Railroad Comm'n of Wisconsin v. Chicago, B. & Q. R.R., 257 U.S. 563, 589, 42 S.Ct. 232, 238, 66 L.Ed. 371 (1922) ("Such aids are only admissible to solve doubt and not to create it."); United States v. Kung Chen Fur Corp., 188 F.2d 577, 584, 38 CCPA 107 (1951)
 
 
 [21]
 Kung Chen Fur, 188 F.2d at 585
 
 
 [22]
 The majority concedes that military bases are subject to the required priority for blind vendors. Thus, one or more blind vending stands must be established on every military base. See 20 U.S.C. Secs. 107(b)(2), 107e(3) (1982). Congress expected to double the number of blind vendors in 5 years by removing obstacles to growth and requiring blind vending stands on "all Federal property." (Emphasis supplied.) Randolph-Sheppard Act Amendments of 1974, Pub.L. No. 93-516, Sec. 201, 1974 U.S.CODE CONG. & AD.NEWS 1868, 1869
 
 
 [23]
 S.REP. NO. 937, 93d Cong., 2d Sess. 10, 14-15 (1974)
 
 
 [24]
 1973 Hearings at 31
 
 
 [25]
 20 U.S.C. Secs. 107(b)(1), 107d-3 (1982)
 
 
 [26]
 20 U.S.C. Sec. 107d-3(b)(1) (1982). The existing law in 1974 already required assignment of vending machine income where the machines were in direct competition with blind vendors. In 1974, there were no exemptions from income assignment; yet DOD had refused to assign income to the blind vendors, as required by law. Review of Vending Operations on Federally Controlled Property, Report to the Subcomm. on the Handicapped, Senate Comm. on Labor and Public Welfare, Comp.Gen.Rep. B-176886 at 27 (Sept. 27, 1973) (GAO Report); see Texas State, 6 Cl.Ct. at 733 n. 6
 Thus, in the 1974 amendments, Congress found it necessary to direct the Secretary of HEW to "take such action and promulgate such regulations as he deems necessary to assure compliance" with income sharing. 20 U.S.C. Sec. 107d-3(g) (1982).
 
 
 [27]
 20 U.S.C. Sec. 107d-3(b)(1) (1982)
 
 
 [28]
 The majority misplaces its reliance on Church of the Holy Trinity v. United States, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892), where the Supreme Court adopted a restricted meaning of the word "labor" to include only "cheap, unskilled labor" and not to include preachers. The statute was intended to "remedy the evil" of unskilled immigrants who worked for low wages
 Here, the "evil" expressly includes the military exchanges' use of vending machines to compete with blind vendors. Furthermore, the majority does not adopt a "restricted" meaning of the words "within retail sales outlets." By deleting the words, the majority expands the scope of the exemption. Holy Trinity is devoid of any support for this novel judicial legislation.
 
 
 [29]
 20 U.S.C. Sec. 107(b)(1) (1982)
 
 
 [30]
 S.REP. NO. 937 at 10-11, 17
 
 
 [31]
 Under the majority's holding that military exchanges are wholly exempt from income sharing, the exchanges will continue to profit by competing directly with blind vendors and by blocking the placement of blind vending stands. The majority "thwarts the obvious purpose of the statute" to increase the number of blind vendors on military bases from 46 to 490 or more, by gutting the statute of its two strengths: (1) income sharing and (2) administration by HEW
 
 
 [32]
 Army Air Force Exchange System Randolph-Sheppard Act Compliance Manual, ESM 11-2, p. 2-1
 
 
 [33]
 GAO Report at 26; see Texas State, 6 Cl.Ct. at 733
 
 
 [34]
 Oversight of the Randolph-Sheppard Act, 1979: Hearings Before the Subcomm. on the Handicapped of the Senate Comm. on Labor and Human Resources, 96th Cong., 1st Sess. 93 (1979) (statement of Maj. Gen. Stanley M. Umstead, Jr.) (1979 Oversight Hearings )
 
 
 [35]
 The Claims Court's discussion of whether additional appropriated funds would be necessary to satisfy the judgment is relevant only to Claims Court jurisdiction, and not to the merits of the case. Texas State, 6 Cl.Ct. at 737. Although the majority characterizes this as "tortured" reasoning, the majority concedes that no additional appropriations are necessary to satisfy the judgment
 
 
 [36]
 Scripps-Howard Radio, Inc. v. FCC, 316 U.S. 4, 11, 62 S.Ct. 875, 880, 86 L.Ed. 1229 (1942)
 
 
 [37]
 Harrison v. PPG Indus., Inc., 446 U.S. 578, 592, 100 S.Ct. 1889, 1897, 64 L.Ed.2d 525 (1980)
 
 
 [38]
 United States R.R. Retirement Bd. v. Fritz, 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980)
 
 
 [39]
 Albernaz v. United States, 450 U.S. 333, 342, 101 S.Ct. 1137, 1144, 67 L.Ed.2d 275 (1981) (quoting United States R.R., 449 U.S. at 179, 101 S.Ct. at 461)
 The majority implies that DOD had "no opportunity for input" to the Senate Committee because it did not appear at one meeting on January 19, 1974. The majority ignores the lengthy statement of Lt. Gen. Leo E. Benade, Deputy Assistant Secretary for Military Personnel Policy, Department of Defense, on November 19, 1973, before the subcommittee. DOD repeatedly expressed its concern for the impact of the Randolph-Sheppard Act on the military exchange system, with particular emphasis on vending machines. DOD warned the subcommittee that "[t]he proposed changes to the Randolph-Sheppard Act would reduce [the military exchanges' income from vending machines] by as much as $20 million each year" (out of a total income of $66 million/year). 1973 Hearings at 98-103.
 DOD's estimate of the impact on military exchanges turned out to be an overstatement. At the 1979 Oversight Hearings, DOD admitted that it would be liable for only $4.4 million in income sharing under the statute out of $120 million received by the exchanges annually. 1979 Oversight Hearings at 93.
 The majority's cry that the statute tolls the death knell for the military exchanges is simply untrue, since the exchanges are subject to sharing less than 4 percent of their income. It cannot be said that Congress was unaware of the consequences of its act, since it was warned of consequences far more severe than would actually result from applying the statute. Congress was fully aware of the military exchanges' use of vending machines income, both from Lt. Gen. Benade's statement and from GAO's thorough investigation of DOD.
 
 
 [40]
 See 2A N. SINGER, SUTHERLAND STATUTORY CONSTRUCTION Sec. 51.03 (4th ed. 1984)
 
 
 [41]
 Aldridge v. Williams, 3 How 9, 24, 44 U.S. 9, 24, 11 L.Ed. 469 (1845)
 
 
 [42]
 Wisconsin R.R. Comm'n, 257 U.S. at 589, 42 S.Ct. at 237
 
 
 [43]
 Pennsylvania R.R. v. International Coal Mining Co., 230 U.S. 184, 199, 33 S.Ct. 893, 897, 57 L.Ed. 1446 (1913)
 
 
 [44]
 Wisconsin R.R. Comm'n, 257 U.S. at 589, 42 S.Ct. at 238
 
 
 [45]
 Friedman v. United States, 310 F.2d 381, 159 Ct.Cl. 1 (1962), cert. denied, Lipp v. United States, 373 U.S. 932, 83 S.Ct. 1540, 10 L.Ed.2d 691 (1963):
 " * * * The earlier colloquy at the hearings involving Congressmen Doyle and Clements--on which reliance has been placed * * *--can be said to represent only their own views and not the position of the subcommittee, or the full committee, let alone of the House or the Senate as a whole." 310 F.2d at 405.
 
 
 [46]
 Aldridge, 44 U.S. at 24
 
 
 [47]
 Northern Colo. Water Conservancy Dist. v. Federal Energy Regulatory Comm'n, 730 F.2d 1509, 1518 (D.C.Cir.1984) (quoting Chrysler Corp. v. Brown, 441 U.S. 281, 311, 99 S.Ct. 1705, 1722, 60 L.Ed.2d 208 (1979)). See also General Elec. Co. v. United States, 610 F.2d 730, 734, 221 Ct.Cl. 771 (1979)
 
 
 [48]
 Hart, 585 F.2d at 1035
 
 
 [49]
 W. Moorhead, A Congressman Looks at the Planned Colloquy and Its Effect in the Interpretation of Statutes, reprinted in 3 C. SANDS, SUTHERLAND STATUTORY CONSTRUCTION 639 (4th ed. 1973)
 
 
 [50]
 Hart, 285 F.2d at 1035
 
 
 [51]
 120 CONG.REC. 35,712 (1974)
 
 
 [52]
 Id. Also, the remarks were made after the Senate voted. See Texas State, 6 Cl.Ct. at 741. Although both houses voted again over 1 month later to override the veto, it is not realistic to assume that Congress even considered this bit of colloquy, grown stale in the record, over the words in the bill itself. "Congress may be presumed not unskilled in the use of words and highly likely to have enacted what it intended." Hart, 585 F.2d at 1035
 
 
 [53]
 W. Moorhead, reprinted in 3 C. SANDS, SUTHERLAND STATUTORY CONSTRUCTION at 639
 
 
 [54]
 W. Gilbert, H.M.S. Pinafore, Act II (1878), quotation reprinted in J. Bartlett, Familiar Quotations 623 (11th ed. 1937)
 
 
 [55]
 Ricker v. United States, 396 F.2d 454, 456, 184 Ct.Cl. 402 (1968) (quoting 62 Cases, More or Less Each Containing Six Jars of Jam v. United States, 340 U.S. 593, 596, 71 S.Ct. 515, 518, 95 L.Ed. 566 (1951)
 
 
 [56]
 Ricker, 396 F.2d at 456
 
 
 [57]
 Id
 
 
 [58]
 Id
 
 
 [59]
 20 U.S.C. Sec. 107d-3(b) (1982)
 
 
 [60]
 See 2A N. SINGER, SUTHERLAND STATUTORY CONSTRUCTION Sec. 48.16
 
 
 [61]
 Badeau v. United States, 21 Ct.Cl. 48, 49-50 (1886); see United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 348-49, 83 S.Ct. 1715, 1733-34, 10 L.Ed.2d 915 (1963); Waterman S.S. Corp. v. United States, 381 U.S. 252, 268-69, 85 S.Ct. 1389, 1398, 14 L.Ed.2d 370 (1965). See also Key Buick Co. v. Commissioner, 68 T.C. 178, 183 (1977), aff'd, 613 F.2d 1306 (5th Cir.1980)
 
 
 [62]
 1979 Oversight Hearings at 93. The majority also discounts the testimony and letters from the GAO in connection with the 1979 Oversight Hearings, in which GAO found that the DOD regulation was inconsistent with the statute as well as with the authorized HEW regulations. Finally, the majority reverses the well-reasoned decisions of the arbitration panel and of the Claims Court
 
 
 [63]
 See Texas State, 6 Cl.Ct. at 733 n. 6
 
 
 [64]
 S.REP. NO. 937, 93d Cong., 2d Sess. at 16, 19 (1974)
 
 
 [65]
 20 U.S.C. Sec. 107(b) (1982). The functions under the Randolph-Sheppard Act which were administered by the Secretary of HEW are now administered by the Secretary of Education. 20 U.S.C. Sec. 3441 (1982). For the purposes of this opinion, I will continue to refer to HEW because the regulations in question were promulgated by HEW rather than by Education
 
 
 [66]
 20 U.S.C. Sec. 107(b) (1982)
 
 
 [67]
 Id
 
 
 [68]
 20 U.S.C. Sec. 107a(a) (1982). The only other reference to DOD in the act is that "Federal property" is defined to include DOD property. 20 U.S.C. Sec. 107e(3) (1982). DOD is not "charged with enforcing" the act. Actually, DOD is not given any authority whatsoever under the act. Cf. United States v. Riverside Bayview Homes, Inc., --- U.S. ----, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985)
 
 
 [69]
 20 U.S.C. Secs. 107d-1, 107d-2 (1982)
 
 
 [70]
 20 U.S.C. Sec. 107d-3(g)
 
 
 [71]
 Exec. Order No. 12,146, 3 C.F.R. 409 (1980)
 
 
 [72]
 See, e.g., 38 Op.Att'y Gen. 149 (1934); 37 Op.Att'y Gen. 34 (1932); 32 Op.Att'y Gen. 472 (1921)
 
 
 [73]
 Oklahoma, 741 F.2d at 293
 
 
 [74]
 See Northern Colo., 730 F.2d at 1517
 
 
 [75]
 Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 863-64, 104 S.Ct. 2778, 2792, 81 L.Ed.2d 694 (1984)
 
 
 [76]
 43 Fed.Reg. 25,337-42. DOD's actions are inconsistent with its argument of ambiguity. Query: If the statute contained any support for DOD's interpretation, why was DOD so vigorous in attempting to change the statute and the HEW regulation which tracked the statute? Why did DOD promulgate its own regulation instead of simply withholding the income under the statute and the HEW regulation as written?
 
 
 [77]
 Id. at 25,339
 
 
 [78]
 The majority misplaces its reliance on Riverside Bayview Homes, 106 S.Ct. at 461, since Congress charged HEW and not DOD with enforcing the statute. Thus, it is HEW's regulation which is entitled to deference
 
 
 *
 The House voted 398 for, 7 against, and the Senate 90 for, 1 against, to override President Ford's veto